# EXHIBIT C

**EXHIBIT C**

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

|  |  |
|---|---|
| DANIEL H. FISSEHA, an individual, and BERHANEMESKEL W. GEBRESELASSIE, an individual, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| vs. | )<br>)<br>) |
| KING COUNTY, a home rule charter county of the State of Washington, KING COUNTY DEPARTMENT OF METROPOLITAN SERVICES, d/b/a KING COUNTY METRO TRANSIT, is an agency of KING COUNTY, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

Case No.: 23-2-03262-4

**AMENDED COMPLAINT**

Plaintiffs Daniel H. Fisseha and Berhanemeskel W. Gebreselassie, by and through their

counsel, complain and aver as follows:

## I.     <u>PARTIES, JURISDICTION, AND VENUE</u>

1.1     <u>Status of Plaintiff Fisseha</u>. Plaintiff Daniel H. Fisseha is an individual residing in

King County, Washington.

1.2     <u>Status of Plaintiff Gebreselassie</u>. Plaintiff Berhanemeskel W. Gebreselassie is an

individual residing in Snohomish County, Washington.

1.3     <u>Status of Defendant King County</u>. Defendant King County is a home rule charter

county of the state of Washington. Upon information and belief, defendant King County

Department of Metropolitan Services is owned, operated, and/or maintained by defendant King

County.

ROCKE | LAW Group, PLLC
500 Union Street, Suite 909
Seattle, WA 98101
(206) 652-8670

1.4     Status of Defendant King County Department of Metropolitan Services. Defendant King County Department of Metropolitan Services, d/b/a King County Metro Transit, is an agency of defendant King County. Upon information and belief, it is controlled, operated, and/or maintained by defendant King County.

1.5     Jurisdiction. This court has jurisdiction over the subject matter and parties in this civil action.

1.6     Venue. Venue is proper in King County, Washington.

## II.     FACTS

2.1     Fisseha and Gebreselassie both work for Defendant King County Metro Transit (KC Metro). Plaintiffs both hired in as transit operators in 2008 and now both hold the position of transit supervisor.

2.2     Fisseha and Gebreselassie are both Ethiopian immigrants and on occasion converse with each other in their native language, Amharic.

2.3     On or about May 5, 2021, while at work, Fisseha's and Gebreselassie's supervisor, Chief Riceda Stewart, directed that Fisseha and Gebreselassie could no longer speak Amharic in the workplace while in the presence of other employees. Chief Stewart further stated that by conversing in Amharic they were not "presenting and acting like a professional." Chief Stewart continued that they could only speak English at work and if they wanted to speak Amharic, they would have to find a private room for the conversation. Chief Stewart concluded by noting that Fisseha's and Gebresellassie's superintendent, Dennis Lock, had knowledge of and approved Chief Stewart's English-only directive to them.

2.4     Upon information and belief, prior to May 5, 2021, a coworker told Chief Stewart that while in a public office, Fisseha and Gebreselassie were conversing in a language other than English. Chief Stewart and Superintendent Lock then met to discuss how to address the issue and decided on the English-only rule to implement against them.

ROCKE | LAW Group, PLLC
500 Union Street, Suite 909
Seattle, WA 98101
(206) 652-8670

2.5     Chief Stewart and Superintendent Lock did not investigate to determine the validity of the complaint; seek input or guidance from Fisseha or Gebreselassie, other employees, or departments before implementation of the English-only rule against them; or consider the impact of the English-only rule on them.

2.6     After Chief Stewart informed Fisseha and Gebreselassie of the English-only rule, they requested the rule and its terms in writing. Chief Stewart indicated they would receive follow-up communication regarding the rule in writing. They never received any follow-up correspondence regarding the English-only rule.

2.7     Shortly thereafter Fisseha and Gebreselassie reported KC Metro's imposition of the English-only rule on them to the KC Metro Office of Equal Employment Opportunity, Equity and Inclusion (the EEO Office). Upon information and belief, the EEO Office contacted Chief Stewart and Superintendent Lock informing them that Gebreselassie and Fisseha had filed a report and providing guidance on the English-only rule. A copy of KC Metro's Finding Report of the EEO Office is attached hereto as Exhibit 1.

2.8     After disclosure of the report, Fisseha and Gebreselassie were subjected to retaliation by KC Metro. Specifically, their schedules were changed numerous times to make them take inconsistent and unfavorable shifts, which had not been the practice before reporting Chief Stewart and Superintendent Lock, and their overall workload was increased. Gebreselassie and Fisseha were also accused of cheating on training.

2.9     Following the report to the EEO Office, conditions grew so intolerable for Mr. Fisseha that he was forced to take leave due to stress and anxiety. Due to this leave, he used all of his paid leave and was out for a period of unpaid leave to cope with the conditions as a result of KC Metro's retaliation. Mr. Fisseha's only option was to transfer to another division where he would not experience retaliation. This transfer required him to take less desirable "graveyard" shifts.

ROCKE | LAW Group, PLLC
500 Union Street, Suite 909
Seattle, WA 98101
(206) 652-8670

2.10    Following the report to the EEO Office, conditions grew so intolerable for Mr. Gebresselassie that he also took leave due to stress and anxiety. He exhausted all his paid leave. Due to the stress and anxiety, Mr. Gebresselassie felt his only option was to transfer to another division with less desirable shifts.

2.11    Upon information and belief, KC Metro intentionally discriminated against Fisseha and Gebresselassie and acted maliciously or with reckless indifference.

### III.    ADMINISTRATIVE PROCEDURES

3.1    The EEO Office's investigative and finding report concerning the County's implementation of the English-only rule to plaintiffs was issued March 1, 2022. The EEOC issued notices of right to sue for Gebreselassie and Fisseha on November 25, 2022.

3.2    The Washington Human Rights Commission investigated Gebresselassie's and Fisseha's complaints and issued notices of right to sue for Gebresselassie and Fisseha on October 21, 2022.

3.3    Mr. Fisseha's claim for damages was filed with King County on January 5, 2023. More than 60 days have elapsed since the tort claim for damages was properly served or filed.

3.4    Mr. Gebreselassie's claim for damages was filed with or served upon King County on September 14, 2022. More than 60 days have elapsed since the tort claim for damages was properly served or filed.

### IV.    CAUSES OF ACTION

### A.  CAUSE OF ACTION ONE: VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT AND– DISCRIMINATION

4.1    Fisseha and Gebreselassie reallege and incorporate all prior allegations as though restated in full herein.

4.2    Title VII and WLAD all adhere to this framework. To plead a *prima facia* claim for discrimination under Title VII and the WLAD, a plaintiff must allege: (1) plaintiff belonged to a protected class; (2) plaintiff performed the job to legitimate expectation; (3) plaintiff suffered an adverse employment action; and (4) employees with similar qualifications were treated more

favorably or some circumstance suggests discriminatory motive. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998); *see also Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* 470 F.3d 827, 837-38 (9th Cir. 2006) (affirming that Title VII substantive standards apply to a § 1981 claim); *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wash.2d 516, 404 P.3d 464, 470-71 (2017) (applying McDonnell Douglas framework to claims under the WLAD).

4.3    Through the actions of Chief Stewart and Superintendent Lock, KC Metro discriminated against Fisseha and Gebreselassie with respect to the terms, conditions, or privileges of employment because of national origin, in violation of 42 U.S.C. § 2000e-2(a)(1).

4.4    Specifically, Plaintiffs belonged to a protected class based on their national origin. Specifically, plaintiffs are Ethiopian and were conversing in their native language, Amharic.

4.5    Plaintiffs were performing their jobs to the reasonable expectation of defendants.

4.6    Plaintiffs suffered an adverse action in that they were told their national origin identities made people uncomfortable and were not appropriate in the workplace, and were forced to endure an intimidating, hostile, or abusive work environment because of using their native language.

4.7    Other employees with the same qualifications, but who were not conversing in Amharic, were treated more favorably. Specifically, such employees were not singled out and told that they needed to use a private room to speak in their native language. Such employees were not reprimanded for being "unprofessional." Further, such employees did not have their scheduling changed erratically, or put on different shifts from others of the same national origin.

4.8    Fisseha and Gebresselassie have been damaged in an amount to be determined at trial.

**B.  CAUSE OF ACTION TWO: VIOLATION OF TITLE VII – RETALIATION**

5.1    Fisseha and Gebreselassie reallege and incorporate all prior allegations as though restated in full herein.

ROCKE | LAW Group, PLLC
500 Union Street, Suite 909
Seattle, WA 98101
(206) 652-8670

5.2     To make a claim for retaliation, plaintiffs must show (1) they engaged in protected activity; (2) the defendants took an adverse action against plaintiffs; and (3) there was a causal link between plaintiffs' protected activity and the adverse action taken by defendants. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000).

5.3     KC Metro retaliated against Fisseha and Gebreselassie for opposing unlawful or discriminatory employment practices, in violation of 42 U.S.C. § 2000e-3(a).

5.4     Fisseha and Gebreselassie engaged in protective activity by filing a complaint against Chief Stewart and Superintendent Lock for their imposition of the English-only policy for plaintiffs.

5.5     Defendants took an adverse action against plaintiffs by inconsistently changing their schedules to force them into unfavorable shifts; promoting a work environment that was an intimidating, hostile, or abusive work environment; and generally causing Fisseha and Gebreselassie's stress and anxiety as a result of their reporting the English-only policy.

5.6     There is a causal connection between the protected activity and the adverse actions taken by Defendants—inconsistent changes in scheduling did not occur until after plaintiffs reported the violative English-only policy. Further, other similarly situated employees, who were not subjected to or did not file a complaint regarding the English-only directive, did not experience these adverse actions.

5.7     Fisseha and Gebresselassie have been damaged in an amount to be determined at trial.

**C.  CAUSE OF ACTION THREE: VIOLATION OF THE WLAD – DISCRIMINATION**

6.1     Fisseha and Gebreselassie reallege and incorporate all prior allegations as though restated in full herein.

6.2     The Washington Law Against Discrimination contained within RCW Title 49.60 provides that an individual has the right to be free from discrimination because of national origin in their right to hold employment. *See* RCW 49.60.030.

ROCKE | LAW Group, PLLC
500 Union Street, Suite 909
Seattle, WA 98101
(206) 652-8670

6.3    Discrimination claims under WLAD follow the same elements and burden shifting analysis as claims made under Title VII. *See Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 355 (2007).

6.4    As stated above, through the actions of Chief Stewart and Superintendent Lock, KC Metro discriminated against Messrs. Fisseha and Gebreselassie with respect to the terms or conditions of employment because of national origin, in violation of RCW 49.60.030(1)(a) and 49.60.180(3).

**D.  CAUSE OF ACTION FOUR: VIOLATION OF WLAD – RETALIATION**

7.1    Fisseha and Gebreselassie reallege and incorporate all prior allegations as though restated in full herein.

7.2    The Washington Law Against Discrimination contained within RCW Title 49.60 provides that an individual has the right to be free from employer retaliation for opposing unlawful or discriminatory employment practices. See RCW 49.60.210(1).

7.3    Retaliation claims under the WLAD follow the same elements as claims made under Title VII. *See Cornwall v. Microsoft Corp.*, 192 Wn.2d 403, 411-12 (2018); *Kahn v. Salerno*, 90 Wn. App. 110, 129 (1998).

7.4    As stated above, KC Metro impermissibly retaliated against Fisseha and Gebreselassie, in violation of RCW 49.60.210(1).

**IV.    PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

(1)    Actual and compensatory damages;

(2)    Punitive damages;

(3)    Interest;

(4)    Equitable adjustment for any tax consequences;

(5)    An injunction prohibiting English-language only discrimination, commanding the defendant adopt a new, compliant, written policy and train management to comply

ROCKE | LAW Group, PLLC
500 Union Street, Suite 909
Seattle, WA 98101
(206) 652-8670

1      with it; to report to the court compliance and any substantially similar complaints,

2      civil actions, or charges of discrimination for the next six years;

3      (6)   Attorney's fees and costs; and

4      (7)   For such other and further relief as the Court may deem just and proper.

5      Dated this 7th day of March, 2023.

6                                                    ROCKE │ LAW Group, PLLC

7

8                                                    _____
                                                     Aaron V. Rocke, WSBA No. 31525
9                                                    Rocke Law Group, PLLC
                                                     500 Union Street, Suite 909
10                                                   Seattle, WA 98101
                                                     Telephone: (206) 652-8670
11                                                   Fax: (206) 452-5895
                                                     Email: aaron@rockelaw.com
12                                                   Attorney for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## DECLARATION OF SERVICE

I caused a copy of the foregoing Amended Complaint to be served to the following in the manner indicated:

**Via Email Pursuant to RCW 4.28.080 and KCC 2.04.010:**

King County Council Clerk
clerkserviceprocess@kingcounty.gov
clerkemergencyserviceprocess@kingcounty.gov

on today's date.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct to the best of my belief.

Signed and DATED this 7th day of March 2023, in Seattle Washington.

_s/ Elena Maltos_____
Elena Maltos, Legal Assistant
ROCKE | LAW Group, PLLC

ROCKE | LAW Group, PLLC
500 Union Street, Suite 909
Seattle, WA 98101
(206) 652-8670

# EXHIBIT 1

## Berhanemeskel Gebreselassie/G004177 – Coded Exemption Key for Redacted Records
*Please refer to this table to match the code on the redacted record to the applicable exemption.*

| CODE | WHAT EXEMPTION THE CODE STANDS FOR | STATUTE/CASE | BRIEF EXPLANATION OF HOW EXEMPTION APPLIES |
|---|---|---|---|
| NM EMP | Identity of employee in discrimination or harassment investigation - Employment and Licensing | RCW 42.56.250(6) | The names of the complaining employees and witnesses have been redacted from the investigative records of possible unfair practice under chapter 49.60 RCW, possible violation of other federal, state, or local laws prohibiting discrimination or harassment in employment, employing agency's internal policies prohibiting discrimination or harassment in employment.  Unless a complainant, other accuser, or witness consent to the disclosure of their name, the investigation record can only be released with their names redacted. |



**King County**

**Metro Transit Department**
**Office of EEO, Equity and Inclusion**
**201 S. Jackson Street**
**KSC-TR-0230**
**Seattle, WA  98104-3856**

**Date:  March 1, 2022**

**To:**    Carri Brezonick, Bus Operations Section Manager

Tim Flanagan, Bus Operations Director

**Fr:**    Chris Bhang, EEO Officer

**Cc:**    Terry White, General Manager

Michelle Allison, Deputy General Manager

**RE:    Finding Report EEO Office – Lock & Stewart**

### I.    Introduction

Bus Operations employees and then-SIT instructors NM EMP and
NM EMP reported on May 5, 2021, that their supervisor, Chief
Riceda Stewart, directed them to only speak English at work and to use a private room
if they wanted to speak in another language. They reported their superintendent, Dennis
Lock, had supported Ms. Stewart's directive. Both employees made reports via e-mail.
The EEO Office worked with Section Manager Carri Brezonick, and on May 10th Ms.
Stewart and Mr. Lock were notified that a report had been made and were provided
guidance regarding English-only policies.

The EEO Office met with Mr. NM EMP and Mr. NM EMP to take a full statement.
The employees raised additional issues regarding their experience in the SIT program.
Due to management changes in the EEO Office, the investigation into this report was
paused until an evaluation could be made regarding the scope. A formal investigation
was opened on January 18, 2022.

### II.    Allegation(s)

From the complaint document provided to the parties, the following allegations were
investigated:

Mr. NM EMP and Mr. NM EMP allege that on May 5, 2021, their Chief, Riceda
Stewart, told them that they were not "presenting and acting like a professional" and
were making other frontline supervisors uncomfortable by speaking to each other in a

language other than English. Mr. █NM EMP█ and Mr. █NM EMP█ allege they were told they could not communicate with each other in a language other than English while at work and had to use a room other than the offices if they wanted to speak to each other in a language other than English. Mr. █NM EMP█ and Mr. █NM EMP█ allege that Superintendent Lock knew of and approved this action.

Mr. █NM EMP█ and Mr. █NM EMP█ allege that the action taken by Chief Stewart with the knowledge and approval of Superintendent Lock was based on their actual or perceived protected class status and is discriminatory.

Mr. █NM EMP█ and Mr. █NM EMP█ were speaking Amharic, the official language of their country of origin, Ethiopia.

### III.   Relevant Policy Definitions

From the County's Nondiscrimination, Anti-Harassment & Inappropriate Conduct Policy & reporting Procedures (2021) the following definitions are relevant:

**Discrimination** occurs when an employer takes a discrete adverse employment action against an employee and the employee's protected status was a substantial factor in the employer's decision.

**Inappropriate Conduct** is conduct that, while not rising to the level of unlawful discrimination, harassment, sexual harassment or retaliation, communicates a hostile, derogatory, unwelcome or negative message about persons based on a protected status. Inappropriate conduct can be either verbal or nonverbal and includes slights, insults, and other conduct that a reasonable person would find offensive.

### IV.   Investigative Process Timeline

The EEO Office began a formal investigation on January 18, 2022. The evidence gathering portion of the process was completed on January 28, 2022.

### V.   Witness(es)

The following employees were interviewed:

█NM EMP█, witness

█NM EMP█, complainant

█NM EMP█, complainant

Dennis Lock, respondent

Riceda Stewart, respondent

### VI.   Evidence

Other than the e-mail reports made by Mr. █NM EMP█ and Mr. █NM EMP█ there are no other known e-mails or other documents related to this matter. The EEO Office

reviewed job announcements and class specifications as well employee files and TELR-provided investigation reports that included the employees involved in this case.

## VII.   Analysis

The federal Equal Employment Opportunity Commission ("EEOC") guidance defines English-only rules as "restrictive language policies or practices."[1] The EEOC uses the words "rule" and "policy" interchangeably. In this matter, regardless of whether the action is a policy or a rule, the alleged directive would violate Title VII if it does not comply with the EEOC's guidance. This document will refer to the directive given to Mr. NM EMP and Mr. NM EMP as a rule because it did not go through any sort of formal review and approval process as would be expected to implement a new policy.

### a.  Evidence Gathered

The parties do not dispute the following:

1. Mr. NM EMP and Mr. NM EMP were in the public area of the SIT office and spoke to each other in a language other than English.[2]
2. An operator complained to Ms. Stewart about Mr. NM EMP and Mr. NM EMP speaking a language other than English in the office.[3]
3. Ms. Stewart told Mr. NM EMP and Mr. NM EMP to use a private room if they wanted to speak to each other in a language other than English.[4]
4. Mr. Lock approved Ms. Stewart's English-only policy before she spoke to Mr. NM EMP and Mr. NM EMP.[5]

While Ms. Stewart did not recall being asked any questions by Mr. NM EMP or Mr. NM EMP she confirmed that she did not provide any follow up e-mails to either employee. Mr. NM EMP and Mr. NM EMP allege they asked for this new rule in writing and were told they would receive follow up communication.

The decision to implement an English-only rule was made by Ms. Stewart and Mr. Lock. They did not seek any other guidance or input before speaking to Mr. NM EMP and Mr. NM EMP. Mr. Lock spoke to Ms. NM EMP about the new rule sometime after he and Ms. Stewart spoke and presumably after Ms. Stewart had spoken to Mr. NM EMP and Mr. NM EMP.[6]

While Ms. Stewart did not specifically confirm she told Mr. NM EMP and Mr. NM EMP that they could not speak a language other than English, this is reasonably the guidance she provided. The employees were told that speaking to each

---

[1] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518826
[2] NM EMP interview 5/20/21, NM EMP interview 5/20/21
[3] Stewart interview 1/28/22
[4] NM EMP initial report 5/5/21, NM EMP initial report 5/5/21, Stewart interview 1/28/22
[5] Lock interview 1/19/22
[6] NM EMP interview 1/21/22

other in a language other than English in the office was "unprofessional" and made an operator uncomfortable, and they were directed to use a private room if they wanted to have conversations in a language other than English.

Both Mr. Lock and Ms. Stewart agreed that the decision was based on the operator's complaint and was intended to ensure the "customer" (i.e., the operator) was comfortable. While Ms. Stewart named instructors as one of her customers, neither manager indicated they considered the impact of their decision on Mr. ███NM EMP███ or Mr. ███NM EMP███ There is no evidence Ms. Stewart or Mr. Lock engaged in any sort of investigation, formal or informal, to determine if the operator's complaint was valid.

Ms. Stewart and Mr. Lock diverge on who led the decision to implement this rule and who came up with the idea of offering the employees a private room.

The English-only rule was not communicated to any other employees, and according to Ms. Stewart, she was not thinking about the other instructors who speak a language other than English because she was only thinking about resolving the specific complaint involving Mr. ███NM EMP███ and Mr. ███NM EMP███

### b. Title VII guidance

The implementation of an English-only rule is covered under Title VII of the Civil Rights Act of 1964 ("Title VII") when employment decisions are made based on "accent, English fluency, and restrictive language policies" because "linguistic characteristics are closely associated with national origin."[7] The EEOC is charged with the enforcement and interpretation of Title VII, and is responsible for developing guidance documents for employers and federal agencies, including the documents referenced in this analysis.

The EEOC's guidance regarding English-only policies states, "[a] workplace English-only rule that is applied only at certain times may be adopted only under very limited circumstances that are justified by business necessity."[8] The EEOC identifies examples of business necessity including:

1. Communication with customers, coworkers, or supervisors who only speak English;
2. In emergencies where a common language is necessary to promote safety;
3. During co-operative work assignments to promote efficiency; and
4. To enable a supervisor who only speaks English to monitor employee performance or communicate with employees.

---

[7] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518821
[8] "What do I need to know about… English-Only Rules", https://www.dol.gov/agencies/oasam/centers-offices/civil-rights-center/internal/policies/english-only-rules

The EEOC is clear that an English-only rule is unlawful if it is not justified by business necessity.[9]

The EEOC also states that employers "must provide adequate notice of language-restrictive policies."[10] The EEOC defines adequate notice as "explaining the rules at a meeting, providing personal notice, sending e-mail, or posting the rule". The EEOC also states adequate notice includes "communicating to employees under what circumstances they will be required to speak in a specific or common language and what will happen if they violate the rule."[11]

### c. Analysis

The analysis of Mr. ███████'s and Mr. ██████████'s complaint has two elements. First is the determination of whether the rule implemented by Ms. Stewart on May 5, 2021, is compliant with Title VII based on the EEOC's enforcement guidance and case law. The second element is whether the rule was specifically discriminatory towards Mr. ████████ and Mr. ████████ and/or created a hostile work environment based on protected class status.

#### i. Title VII compliance

In this matter, the rule was the result of a complaint made by an operator who overheard the employees speaking a language other than English. There is no evidence the operator was spoken to by either Mr. ████████ or Mr. ████████ or was denied assistance in English.[12] The operator overheard Mr. ████████ and Mr. ████████ speaking to one another on a matter that was not related to the operator. Ms. Stewart alleged that the operator felt the instructors' behavior was "unprofessional". There is no evidence that the use of a language other than English by these employees unreasonably interfered with work duties or posed a safety risk.

There is no evidence that Mr. ████████ and Mr. ████████ were unprofessional, but had their behavior been found to be so, Metro already has policies in place to address this. The use of an English-only rule to address interpersonal relationships, as seems to

---

[9] Fact Sheet: Immigrants' Employment Rights under Federal Anti-Discrimination Laws, https://www.eeoc.gov/laws/guidance/fact-sheet-immigrants-employment-rights-under-federal-anti-discrimination-laws#:~:text=The%20EEOC%20has%20stated%20that,time%2C%20will%20rarely%20be%20justified.

[10] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518826

[11] ibid

[12] Mr. Lock indicated that he was only told an operator was "uncomfortable" not that they were denied service. Mr. ████████ and Mr. ████████ confirm they were speaking directly to one another.

be the case here, is not recommended by the EEOC, and would be discriminatory if it cannot be directly tied to workplace safety or business necessity.[13]

Mr. Lock and Ms. Stewart agree that their primary focus in telling Mr. NM EMP and Mr. NM EMP to only speak English or to use a private room was to ensure customers felt more "comfortable". The EEOC states, "It would be unlawful disparate treatment to implement an English-only rule in order to avoid hearing foreign languages in the workplace."[14] In this matter, the comfort of coworkers or customers is not a business need.

There is no evidence Mr. Lock or Ms. Stewart considered anything other than the operator's complaint and "customer comfort" in determining that an English-only rule was necessary. The EEOC expects employers to provide "detailed, fact-specific, and credible evidence" to support the implementation of a language-restrictive policy.[15]

The evidence supports that there was no business need for this English-only rule, and thus it violates Title VII.

ii. **Was the rule discriminatory against Mr. NM EMP and Mr. NM EMP specifically or did it create a hostile work environment based on protected class status?**

1. **Discrimination Analysis**

The County Nondiscrimination Policy outlines discrimination as occurring when an employer takes discrete adverse employment action against an employee and the employee's protected class status was a substantial factor in the employer's decision. Discrete adverse employment action can include action that substantially affects the terms, conditions, and privileges of employment. The EEOC states that discrimination can come in the form of disparate treatment (i.e., that the employee's protected class status was a motivating factor in the action) and/or disparate impact (i.e., when a policy or practice has a significant negative impact on members of a particular protected group but is not job related and consistent with business necessity).[16]

---

[13] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131
[14] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518821 and Janet Ainsworth, *Language, Power, and Identity in the Workplace: Enforcement of "English-Only" Rules by Employers*, 9 Seattle J. Soc. Just. 233, 247-48 (2010)
[15] ibid
[16] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131

### a. Disparate Treatment Analysis

The English-only rule is a direct result of a complaint made by an operator that Mr. NM EMP and Mr. NM EMP were speaking a language other than English in the office and that this was "unprofessional". On its face, this complaint indicates discriminatory bias against Mr. NM EMP and Mr. NM EMP The use of languages other than English in the workplace is not inherently unprofessional or inappropriate.

When Ms. Stewart and Mr. Lock acted to stop the use of any language but English in the office, they affirmed the operator's stance that the employees' use of a language other than English was unprofessional and inappropriate. When Ms. Stewart told Mr. NM EMP and Mr. NM EMP that the English-only rule was because they had made an operator uncomfortable by not speaking English and that the operator thought their behavior was unprofessional, she affirmed to the instructors that her action was based not on prohibited behavior but because their protected class status, in this case their national origin identity, was the problem.

Mr. Lock and Ms. Stewart may very well have been thinking about customer comfort when they agreed to this course of action, but the comfort they wanted to provide was discriminatory against employees who speak a language other than English. While there may not have been formal disciplinary action taken against the instructors, it is clear they were given notice that their behavior was not appropriate and needed to change. They were given a workplace restriction unique to them because they were bi- or multi-lingual. The result of Ms. Stewart's and Mr. Lock's decision in this matter likely constitutes disparate treatment discrimination as outlined by the law and related guidance documents.

### b. Disparate Impact Analysis

Unlike disparate treatment, disparate impact considers whether the policy or practice has a significant negative impact on the members of a Title VII-protected group but is not job related and consistent with business necessity. In this matter, the English-only rule implemented by Ms. Stewart with Mr. Lock's approval has already been determined to not be consistent with business need, and thus it violates Title VII; additionally, under a disparate impact analysis, the impact of the rule could have a significant negative impact on other bilingual or multilingual employees.

Ms. Stewart implemented this policy without considering the impact it would have on other employees. She cannot provide a comparable rule for English-speaking employees who make an operator uncomfortable by their use of English. While she did not indicate plans to implement the rule for all SIT employees, the precedent that only English could be spoken in the SIT office was clearly established. This rule may apply evenly to anyone who speaks a language other than English, but it disproportionately impacts individuals whose language is closely tied to their identity, and, as the EEOC writes, may adversely impact employees because they are limited or "prohibited from

communicating at work-including for work related purposes- in their most effective language."[17]

As stated previously, the EEOC is clear that an English-only rule implemented to "avoid hearing foreign languages in the workplace" is unlawful disparate treatment. While customer comfort may have been the motivating force in Ms. Stewart's and Mr. Lock's action, the only way to achieve that comfort was by eliminating any language but English from the SIT office area. The result of Ms. Stewart's and Mr. Lock's decision in this matter could constitute disparate impact discrimination as outlined by the law and related guidance documents.

## 2. Harassment Analysis

In this matter, Mr. Lock's and Ms. Stewart's actions went beyond just the implementation of an English-only rule. In evaluating whether or not their actions could constitute harassment, the EEOC generally does not consider "simple teasing, offhand comments, or isolated incidents that are not very serious" to be prohibited harassment.[18] Under the County Nondiscrimination Policy, harassment is prohibited when either enduring the conduct becomes a condition of continued employment or the conduct is severe or pervasive enough to create an environment that a reasonable person would consider intimidating, hostile, or abusive.

The EEOC considers, among other things, the following in evaluating if harassment rises to the level of violating the law:

- Whether the conduct was hostile and/or offensive;
- Whether the conduct was physically threatening or intimidating;
- How frequently the conduct was repeated; or
- The context in which the harassment occurred.[19]

In addition, a reasonable analysis can include whether the conduct unreasonably interfered with work performance.

First, it is important to note that Mr. Lock and Ms. Stewart created an English-only rule based on a possibly discriminatory complaint file by an employee. As managers, Mr. Lock and Ms. Stewart reasonably should know that neither Metro nor the County has any rule that bars the use of a language other than English at work. They decided to act against Mr. NM EMP and Mr. NM EMP even though the reported behavior did not violate a policy or performance expectation set for Metro employees. Mr. NM EMP and

---

[17] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131
[18] EEOC National Origin Discrimination, https://www.eeoc.gov/national-origin-discrimination
[19] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131

Mr. **NM EMP** both made it clear that they were not acting inappropriately or unprofessionally during the time in question. They reasonably believed the rule had nothing to do with their actual behavior or professionalism and assumed the rule was intended to be discriminatory.

Given that Ms. Stewart and Mr. Lock are aware they have other employees who are bi- or multi-lingual, they could have implemented an English-only rule for all their employees, not just Mr. **NM EMP** and Mr. **NM EMP** Using the logic applied to the decision, any employee who spoke a language other than English could make a customer uncomfortable. Although Ms. Stewart said she was only thinking about resolving the specific customer complaint involving Mr. **NM EMP** and Mr. **NM EMP** by making the rule specifically about these employees, the rule sent a message that only their shared national origin identity was offensive. Mr. **NM EMP** and Mr. **NM EMP** are aware they have coworkers who speak other languages, but those employees were not required to follow the rule.

Mr. Lock and Ms. Stewart determined it was necessary to tell Mr. **NM EMP** and Mr. **NM EMP** that their use of a language other than English made people uncomfortable, was unprofessional, and needed to change. This is an additional act that was not necessary to, as they put it, ensure customer comfort or to resolve the complaint. The comments only served to make it clear to Mr. **NM EMP** and Mr. **NM EMP** that they needed to hide their national origin identities at work.

When Mr. Lock and Ms. Stewart tied the English-only rule to the complaint filed against Mr. **NM EMP** and Mr. **NM EMP** they did not provide the two employees with any opportunity to provide a defense, and they did not conduct any sort of investigation. When Mr. **NM EMP** and Mr. **NM EMP** said they told Ms. Stewart they did nothing wrong and the rule was unfair, they were only told that Mr. Lock had approved it, effectively ending the conversation. It is stated earlier in this report that no overt punitive action was taken against Mr. **NM EMP** and Mr. **NM EMP** but by implementing the rule without any sort of investigation or defensive opportunity, Mr. Lock and Ms. Stewart reasonably made it clear to Mr. **NM EMP** and Mr. **NM EMP** that it was already decided that their identity was offensive in the workplace.

Finally, Mr. Lock and Ms. Stewart offered Mr. **NM EMP** and Mr. **NM EMP** the choice to self-segregate from their colleagues and supervisors if they wanted to speak in a language other than English at work. The EEOC specifically prohibits segregating employees based on their protected class status.[20] It is reasonable Mr. **NM EMP** and Mr. **NM EMP** found this option to be offensive, and it sent a clear statement that their national origin identities were unwelcome in the workplace.

---

[20] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131

Each action Mr. Lock and Ms. Stewart took in this matter was subjectively offensive to Mr. [NM EMP] and Mr. [NM EMP]   A reasonable person would consider these actions offensive as well given that the actions were not based on existing policy, business need, or the result of a fair investigative process. The total incident may compromise one interaction, but this was not an instance of a single offensive joke or offhanded comment, and this is not an incident that is "not very serious". In this case, Mr. Lock and Ms. Stewart took several actions within the incident on May 5, 2021, that each communicated a clear message that Mr. [NM EMP]'s and Mr. [NM EMP]'s national origin identity was offensive and unprofessional. None of these actions were necessary to resolve the complaint raised by the operator.

In addition, this was not a single incident involving a coworker. The respondents are a chief and superintendent in supervisory authority over Mr. [NM EMP] and Mr. [NM EMP]   In this case, their words and decisions carry more significant weight than a peer would and reasonably would have future consequences if their directives are not followed. Their English-only rule, which is discriminatory, was a rule Mr. [NM EMP] and Mr. [NM EMP]   would have to follow in order to continue in their work as instructors. Both identified concern about future consequences when they asked for the rule in writing.

Finally, Mr. Lock's and Ms. Stewart's English-only rule would reasonably have an impact on Mr. [NM EMP]'s and Mr. [NM EMP]'s ability to effectively do their job. The EEOC recognizes that employees who speak a language other than English may be more effective at work by using these other languages.[21] Mr. [NM EMP] and Mr. [NM EMP]   thought nothing of talking to each other about a work question in their common language and were effectively doing their job regardless of the language they used. However, because of the English-only rule these employees would need to be conscious to not switch into their common language or risk violating their supervisor's rule.[22] The EEOC recognizes the ability of bilingual speakers to switch, even inadvertently, from one language to another while communicating, something that can put bilingual employees at a risk for disciplinary action that other employees are not subject to when there is an English-only policy in place.[23] Mr. [NM EMP] and Mr. [NM EMP]   would have to change how they interacted at work and would have to overcome unconscious skills bilingual people have in order to comply with the policy. This sends a clear message that their national origin status is unwelcome and unprofessional.

---

[21] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131
[22] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131, see endnote 117
[23] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131 see endnote 120

Mr. Lock and Ms. Stewart should not have implemented the English-only rule. They made multiple decisions that day that resulted in overt messages to Mr. NM EMP and Mr. NM EMP that their national origin identities made people uncomfortable and were not appropriate in the workplace, statements that are subjectively and objectively offensive and discriminatory. Mr. Lock's and Ms. Stewart's actions that day were not a single utterance or just the implementation of a neutral rule. The totality of their actions created "an atmosphere of inferiority, isolation, and intimidation"[24] which is sufficiently severe to constitute harassment.

## VIII.   Finding

Using a preponderance of the evidence standard and a reasonable person standard, when Mr. Lock and Ms. Stewart implemented an English-only rule, they violated the County's Nondiscrimination, Anti-Harassment & Inappropriate Conduct Policy & Reporting Procedures by engaging in disparate treatment and potentially disparate impact discrimination.

In addition, Mr. Lock's and Ms. Stewart's actions created a work environment for Mr. NM EMP and Mr. NM EMP based on their protected class status that was intimidating, hostile, or abusive, which constitutes harassment, a violation of the County's Nondiscrimination, Anti-Harassment & Inappropriate Conduct Policy & Reporting Procedures.

---

[24] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131



**King County**

**Metro Transit Department**
**Office of EEO, Equity and Inclusion**
**201 S. Jackson Street**
**KSC-TR-0230**
**Seattle, WA  98104-3856**

**Date:  March 1, 2022**

**To:**     Carri Brezonick, Bus Operations Section Manager

Tim Flanagan, Bus Operations Director

**Fr:**     Chris Bhang, EEO Officer

**Cc:**     Terry White, General Manager

Michelle Allison, Deputy General Manager

**RE:     Finding Report EEO Office – Lock & Stewart**

I.     **Introduction**

Bus Operations employees and then-SIT instructors NM EMP and NM EMP reported on May 5, 2021, that their supervisor, Chief Riceda Stewart, directed them to only speak English at work and to use a private room if they wanted to speak in another language. They reported their superintendent, Dennis Lock, had supported Ms. Stewart's directive. Both employees made reports via e-mail. The EEO Office worked with Section Manager Carri Brezonick, and on May 10th Ms. Stewart and Mr. Lock were notified that a report had been made and were provided guidance regarding English-only policies.

The EEO Office met with Mr. NM EMP and Mr. NM EMP to take a full statement. The employees raised additional issues regarding their experience in the SIT program. Due to management changes in the EEO Office, the investigation into this report was paused until an evaluation could be made regarding the scope. A formal investigation was opened on January 18, 2022.

II.     **Allegation(s)**

From the complaint document provided to the parties, the following allegations were investigated:

Mr. NM EMP and Mr. NM EMP allege that on May 5, 2021, their Chief, Riceda Stewart, told them that they were not "presenting and acting like a professional" and were making other frontline supervisors uncomfortable by speaking to each other in a

language other than English. Mr. NM EMP and Mr. NM EMP allege they were told they could not communicate with each other in a language other than English while at work and had to use a room other than the offices if they wanted to speak to each other in a language other than English. Mr. NM EMP and Mr. NM EMP allege that Superintendent Lock knew of and approved this action.

Mr. NM EMP and Mr. NM EMP allege that the action taken by Chief Stewart with the knowledge and approval of Superintendent Lock was based on their actual or perceived protected class status and is discriminatory.

Mr. NM EMP and Mr. NM EMP were speaking Amharic, the official language of their country of origin, Ethiopia.

### III.    Relevant Policy Definitions

From the County's Nondiscrimination, Anti-Harassment & Inappropriate Conduct Policy & reporting Procedures (2021) the following definitions are relevant:

**Discrimination** occurs when an employer takes a discrete adverse employment action against an employee and the employee's protected status was a substantial factor in the employer's decision.

**Inappropriate Conduct** is conduct that, while not rising to the level of unlawful discrimination, harassment, sexual harassment or retaliation, communicates a hostile, derogatory, unwelcome or negative message about persons based on a protected status. Inappropriate conduct can be either verbal or nonverbal and includes slights, insults, and other conduct that a reasonable person would find offensive.

### IV.    Investigative Process Timeline

The EEO Office began a formal investigation on January 18, 2022. The evidence gathering portion of the process was completed on January 28, 2022.

### V.    Witness(es)

The following employees were interviewed:

NM EMP , witness

NM EMP , complainant

NM EMP , complainant

Dennis Lock, respondent

Riceda Stewart, respondent

### VI.    Evidence

Other than the e-mail reports made by Mr. NM EMP and Mr. NM EMP there are no other known e-mails or other documents related to this matter. The EEO Office

reviewed job announcements and class specifications as well employee files and TELR-provided investigation reports that included the employees involved in this case.

## VII.   Analysis

The federal Equal Employment Opportunity Commission ("EEOC") guidance defines English-only rules as "restrictive language policies or practices."[1] The EEOC uses the words "rule" and "policy" interchangeably. In this matter, regardless of whether the action is a policy or a rule, the alleged directive would violate Title VII if it does not comply with the EEOC's guidance. This document will refer to the directive given to Mr. NM EMP and Mr. NM EMP as a rule because it did not go through any sort of formal review and approval process as would be expected to implement a new policy.

### a.  Evidence Gathered

The parties do not dispute the following:

1. Mr. NM EMP and Mr. NM EMP were in the public area of the SIT office and spoke to each other in a language other than English.[2]
2. An operator complained to Ms. Stewart about Mr. NM EMP and Mr. NM EMP speaking a language other than English in the office.[3]
3. Ms. Stewart told Mr. NM EMP and Mr. NM EMP to use a private room if they wanted to speak to each other in a language other than English.[4]
4. Mr. Lock approved Ms. Stewart's English-only policy before she spoke to Mr. NM EMP and Mr. NM EMP.[5]

While Ms. Stewart did not recall being asked any questions by Mr. NM EMP or Mr. NM EMP she confirmed that she did not provide any follow up e-mails to either employee. Mr. NM EMP and Mr. NM EMP allege they asked for this new rule in writing and were told they would receive follow up communication.

The decision to implement an English-only rule was made by Ms. Stewart and Mr. Lock. They did not seek any other guidance or input before speaking to Mr. NM EMP and Mr. NM EMP. Mr. Lock spoke to Ms. NM EMP about the new rule sometime after he and Ms. Stewart spoke and presumably after Ms. Stewart had spoken to Mr. NM EMP and Mr. NM EMP.[6]

While Ms. Stewart did not specifically confirm she told Mr. NM EMP and Mr. NM EMP that they could not speak a language other than English, this is reasonably the guidance she provided. The employees were told that speaking to each

---

[1] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518826
[2] NM EMP interview 5/20/21, NM EMP interview 5/20/21
[3] Stewart interview 1/28/22
[4] NM EMP initial report 5/5/21, NM EMP initial report 5/5/21, Stewart interview 1/28/22
[5] Lock interview 1/19/22
[6] NM EMP interview 1/21/22

other in a language other than English in the office was "unprofessional" and made an operator uncomfortable, and they were directed to use a private room if they wanted to have conversations in a language other than English.

Both Mr. Lock and Ms. Stewart agreed that the decision was based on the operator's complaint and was intended to ensure the "customer" (i.e., the operator) was comfortable. While Ms. Stewart named instructors as one of her customers, neither manager indicated they considered the impact of their decision on Mr. NM EMP or Mr. NM EMP  There is no evidence Ms. Stewart or Mr. Lock engaged in any sort of investigation, formal or informal, to determine if the operator's complaint was valid.

Ms. Stewart and Mr. Lock diverge on who led the decision to implement this rule and who came up with the idea of offering the employees a private room.

The English-only rule was not communicated to any other employees, and according to Ms. Stewart, she was not thinking about the other instructors who speak a language other than English because she was only thinking about resolving the specific complaint involving Mr. NM EMP and Mr. NM EMP

### b.  Title VII guidance

The implementation of an English-only rule is covered under Title VII of the Civil Rights Act of 1964 ("Title VII") when employment decisions are made based on "accent, English fluency, and restrictive language policies" because "linguistic characteristics are closely associated with national origin."[7] The EEOC is charged with the enforcement and interpretation of Title VII, and is responsible for developing guidance documents for employers and federal agencies, including the documents referenced in this analysis.

The EEOC's guidance regarding English-only policies states, "[a] workplace English-only rule that is applied only at certain times may be adopted only under very limited circumstances that are justified by business necessity."[8] The EEOC identifies examples of business necessity including:

1. Communication with customers, coworkers, or supervisors who only speak English;
2. In emergencies where a common language is necessary to promote safety;
3. During co-operative work assignments to promote efficiency; and
4. To enable a supervisor who only speaks English to monitor employee performance or communicate with employees.

---

[7] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518821

[8] "What do I need to know about… English-Only Rules", https://www.dol.gov/agencies/oasam/centers-offices/civil-rights-center/internal/policies/english-only-rules

The EEOC is clear that an English-only rule is unlawful if it is not justified by business necessity.[9]

The EEOC also states that employers "must provide adequate notice of language-restrictive policies."[10] The EEOC defines adequate notice as "explaining the rules at a meeting, providing personal notice, sending e-mail, or posting the rule". The EEOC also states adequate notice includes "communicating to employees under what circumstances they will be required to speak in a specific or common language and what will happen if they violate the rule."[11]

### c.  Analysis

The analysis of Mr. ██████'s and Mr. ███████'s complaint has two elements. First is the determination of whether the rule implemented by Ms. Stewart on May 5, 2021, is compliant with Title VII based on the EEOC's enforcement guidance and case law. The second element is whether the rule was specifically discriminatory towards Mr. █████ and Mr. █████████ and/or created a hostile work environment based on protected class status.

### i.  Title VII compliance

In this matter, the rule was the result of a complaint made by an operator who overheard the employees speaking a language other than English. There is no evidence the operator was spoken to by either Mr. █████ or Mr. ████████ or was denied assistance in English.[12] The operator overheard Mr. █████ and Mr. █████████ speaking to one another on a matter that was not related to the operator. Ms. Stewart alleged that the operator felt the instructors' behavior was "unprofessional". There is no evidence that the use of a language other than English by these employees unreasonably interfered with work duties or posed a safety risk.

There is no evidence that Mr. █████ and Mr. ████████ were unprofessional, but had their behavior been found to be so, Metro already has policies in place to address this. The use of an English-only rule to address interpersonal relationships, as seems to

---

[9] Fact Sheet: Immigrants' Employment Rights under Federal Anti-Discrimination Laws, https://www.eeoc.gov/laws/guidance/fact-sheet-immigrants-employment-rights-under-federal-anti-discrimination-laws#:~:text=The%20EEOC%20has%20stated%20that,time%2C%20will%20rarely%20be%20justified.
[10] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518826
[11] ibid
[12] Mr. Lock indicated that he was only told an operator was "uncomfortable" not that they were denied service. Mr. █████ and Mr. █████████ confirm they were speaking directly to one another.

be the case here, is not recommended by the EEOC, and would be discriminatory if it cannot be directly tied to workplace safety or business necessity.[13]

Mr. Lock and Ms. Stewart agree that their primary focus in telling Mr. NM EMP and Mr. NM EMP to only speak English or to use a private room was to ensure customers felt more "comfortable". The EEOC states, "It would be unlawful disparate treatment to implement an English-only rule in order to avoid hearing foreign languages in the workplace."[14] In this matter, the comfort of coworkers or customers is not a business need.

There is no evidence Mr. Lock or Ms. Stewart considered anything other than the operator's complaint and "customer comfort" in determining that an English-only rule was necessary. The EEOC expects employers to provide "detailed, fact-specific, and credible evidence" to support the implementation of a language-restrictive policy.[15]

The evidence supports that there was no business need for this English-only rule, and thus it violates Title VII.

    **ii.  Was the rule discriminatory against Mr. NM EMP and Mr. NM EMP specifically or did it create a hostile work environment based on protected class status?**

### 1.  Discrimination Analysis

The County Nondiscrimination Policy outlines discrimination as occurring when an employer takes discrete adverse employment action against an employee and the employee's protected class status was a substantial factor in the employer's decision. Discrete adverse employment action can include action that substantially affects the terms, conditions, and privileges of employment. The EEOC states that discrimination can come in the form of disparate treatment (i.e., that the employee's protected class status was a motivating factor in the action) and/or disparate impact (i.e., when a policy or practice has a significant negative impact on members of a particular protected group but is not job related and consistent with business necessity).[16]

---

[13] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131
[14] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518821 and Janet Ainsworth, *Language, Power, and Identity in the Workplace: Enforcement of "English-Only" Rules by Employers*, 9 Seattle J. Soc. Just. 233, 247-48 (2010)
[15] ibid
[16] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131

### a. Disparate Treatment Analysis

The English-only rule is a direct result of a complaint made by an operator that Mr. NM EMP and Mr. NM EMP were speaking a language other than English in the office and that this was "unprofessional". On its face, this complaint indicates discriminatory bias against Mr. NM EMP and Mr. NM EMP The use of languages other than English in the workplace is not inherently unprofessional or inappropriate.

When Ms. Stewart and Mr. Lock acted to stop the use of any language but English in the office, they affirmed the operator's stance that the employees' use of a language other than English was unprofessional and inappropriate. When Ms. Stewart told Mr. NM EMP and Mr. NM EMP that the English-only rule was because they had made an operator uncomfortable by not speaking English and that the operator thought their behavior was unprofessional, she affirmed to the instructors that her action was based not on prohibited behavior but because their protected class status, in this case their national origin identity, was the problem.

Mr. Lock and Ms. Stewart may very well have been thinking about customer comfort when they agreed to this course of action, but the comfort they wanted to provide was discriminatory against employees who speak a language other than English. While there may not have been formal disciplinary action taken against the instructors, it is clear they were given notice that their behavior was not appropriate and needed to change. They were given a workplace restriction unique to them because they were bi- or multi-lingual. The result of Ms. Stewart's and Mr. Lock's decision in this matter likely constitutes disparate treatment discrimination as outlined by the law and related guidance documents.

### b. Disparate Impact Analysis

Unlike disparate treatment, disparate impact considers whether the policy or practice has a significant negative impact on the members of a Title VII-protected group but is not job related and consistent with business necessity. In this matter, the English-only rule implemented by Ms. Stewart with Mr. Lock's approval has already been determined to not be consistent with business need, and thus it violates Title VII; additionally, under a disparate impact analysis, the impact of the rule could have a significant negative impact on other bilingual or multilingual employees.

Ms. Stewart implemented this policy without considering the impact it would have on other employees. She cannot provide a comparable rule for English-speaking employees who make an operator uncomfortable by their use of English. While she did not indicate plans to implement the rule for all SIT employees, the precedent that only English could be spoken in the SIT office was clearly established. This rule may apply evenly to anyone who speaks a language other than English, but it disproportionately impacts individuals whose language is closely tied to their identity, and, as the EEOC writes, may adversely impact employees because they are limited or "prohibited from

communicating at work-including for work related purposes- in their most effective language."[17]

As stated previously, the EEOC is clear that an English-only rule implemented to "avoid hearing foreign languages in the workplace" is unlawful disparate treatment. While customer comfort may have been the motivating force in Ms. Stewart's and Mr. Lock's action, the only way to achieve that comfort was by eliminating any language but English from the SIT office area. The result of Ms. Stewart's and Mr. Lock's decision in this matter could constitute disparate impact discrimination as outlined by the law and related guidance documents.

## 2.  Harassment Analysis

In this matter, Mr. Lock's and Ms. Stewart's actions went beyond just the implementation of an English-only rule. In evaluating whether or not their actions could constitute harassment, the EEOC generally does not consider "simple teasing, offhand comments, or isolated incidents that are not very serious" to be prohibited harassment.[18] Under the County Nondiscrimination Policy, harassment is prohibited when either enduring the conduct becomes a condition of continued employment or the conduct is severe or pervasive enough to create an environment that a reasonable person would consider intimidating, hostile, or abusive.

The EEOC considers, among other things, the following in evaluating if harassment rises to the level of violating the law:

- Whether the conduct was hostile and/or offensive;
- Whether the conduct was physically threatening or intimidating;
- How frequently the conduct was repeated; or
- The context in which the harassment occurred.[19]

In addition, a reasonable analysis can include whether the conduct unreasonably interfered with work performance.

First, it is important to note that Mr. Lock and Ms. Stewart created an English-only rule based on a possibly discriminatory complaint file by an employee. As managers, Mr. Lock and Ms. Stewart reasonably should know that neither Metro nor the County has any rule that bars the use of a language other than English at work. They decided to act against Mr. NM EMP and Mr. NM EMP even though the reported behavior did not violate a policy or performance expectation set for Metro employees. Mr. NM EMP and

---

[17] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131

[18] EEOC National Origin Discrimination, https://www.eeoc.gov/national-origin-discrimination

[19] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131

Mr. **NM EMP** both made it clear that they were not acting inappropriately or unprofessionally during the time in question. They reasonably believed the rule had nothing to do with their actual behavior or professionalism and assumed the rule was intended to be discriminatory.

Given that Ms. Stewart and Mr. Lock are aware they have other employees who are bi- or multi-lingual, they could have implemented an English-only rule for all their employees, not just Mr. **NM EMP** and Mr. **NM EMP** Using the logic applied to the decision, any employee who spoke a language other than English could make a customer uncomfortable. Although Ms. Stewart said she was only thinking about resolving the specific customer complaint involving Mr. **NM EMP** and Mr. **NM EMP** by making the rule specifically about these employees, the rule sent a message that only their shared national origin identity was offensive. Mr. **NM EMP** and Mr. **NM EMP** are aware they have coworkers who speak other languages, but those employees were not required to follow the rule.

Mr. Lock and Ms. Stewart determined it was necessary to tell Mr. **NM EMP** and Mr. **NM EMP** that their use of a language other than English made people uncomfortable, was unprofessional, and needed to change. This is an additional act that was not necessary to, as they put it, ensure customer comfort or to resolve the complaint. The comments only served to make it clear to Mr. **NM EMP** and Mr. **NM EMP** that they needed to hide their national origin identities at work.

When Mr. Lock and Ms. Stewart tied the English-only rule to the complaint filed against Mr. **NM EMP** and Mr. **NM EMP** they did not provide the two employees with any opportunity to provide a defense, and they did not conduct any sort of investigation. When Mr. **NM EMP** and Mr. **NM EMP** said they told Ms. Stewart they did nothing wrong and the rule was unfair, they were only told that Mr. Lock had approved it, effectively ending the conversation. It is stated earlier in this report that no overt punitive action was taken against Mr. **NM EMP** and Mr. **NM EMP** but by implementing the rule without any sort of investigation or defensive opportunity, Mr. Lock and Ms. Stewart reasonably made it clear to Mr. **NM EMP** and Mr. **NM EMP** that it was already decided that their identity was offensive in the workplace.

Finally, Mr. Lock and Ms. Stewart offered Mr. **NM EMP** and Mr. **NM EMP** the choice to self-segregate from their colleagues and supervisors if they wanted to speak in a language other than English at work. The EEOC specifically prohibits segregating employees based on their protected class status.[20] It is reasonable Mr. **NM EMP** and Mr. **NM EMP** found this option to be offensive, and it sent a clear statement that their national origin identities were unwelcome in the workplace.

---

[20] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131

Each action Mr. Lock and Ms. Stewart took in this matter was subjectively offensive to Mr. [NM EMP] and Mr. [NM EMP]   A reasonable person would consider these actions offensive as well given that the actions were not based on existing policy, business need, or the result of a fair investigative process. The total incident may compromise one interaction, but this was not an instance of a single offensive joke or offhanded comment, and this is not an incident that is "not very serious". In this case, Mr. Lock and Ms. Stewart took several actions within the incident on May 5, 2021, that each communicated a clear message that Mr. [NM EMP]'s and Mr. [NM EMP]'s national origin identity was offensive and unprofessional. None of these actions were necessary to resolve the complaint raised by the operator.

In addition, this was not a single incident involving a coworker. The respondents are a chief and superintendent in supervisory authority over Mr. [NM EMP] and Mr. [NM EMP]   In this case, their words and decisions carry more significant weight than a peer would and reasonably would have future consequences if their directives are not followed. Their English-only rule, which is discriminatory, was a rule Mr. [NM EMP] and Mr. [NM EMP]   would have to follow in order to continue in their work as instructors. Both identified concern about future consequences when they asked for the rule in writing.

Finally, Mr. Lock's and Ms. Stewart's English-only rule would reasonably have an impact on Mr. [NM EMP]'s and Mr. [NM EMP]'s ability to effectively do their job. The EEOC recognizes that employees who speak a language other than English may be more effective at work by using these other languages.[21] Mr. [NM EMP] and Mr. [NM EMP]   thought nothing of talking to each other about a work question in their common language and were effectively doing their job regardless of the language they used. However, because of the English-only rule these employees would need to be conscious to not switch into their common language or risk violating their supervisor's rule.[22] The EEOC recognizes the ability of bilingual speakers to switch, even inadvertently, from one language to another while communicating, something that can put bilingual employees at a risk for disciplinary action that other employees are not subject to when there is an English-only policy in place.[23] Mr. [NM EMP] and Mr. [NM EMP]   would have to change how they interacted at work and would have to overcome unconscious skills bilingual people have in order to comply with the policy. This sends a clear message that their national origin status is unwelcome and unprofessional.

---

[21] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131
[22] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131, see endnote 117
[23] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131 see endnote 120

Mr. Lock and Ms. Stewart should not have implemented the English-only rule. They made multiple decisions that day that resulted in overt messages to Mr. ██NM EMP██ and Mr. ██NM EMP██ that their national origin identities made people uncomfortable and were not appropriate in the workplace, statements that are subjectively and objectively offensive and discriminatory. Mr. Lock's and Ms. Stewart's actions that day were not a single utterance or just the implementation of a neutral rule. The totality of their actions created "an atmosphere of inferiority, isolation, and intimidation"[24] which is sufficiently severe to constitute harassment.

### VIII.   Finding

Using a preponderance of the evidence standard and a reasonable person standard, when Mr. Lock and Ms. Stewart implemented an English-only rule, they violated the County's Nondiscrimination, Anti-Harassment & Inappropriate Conduct Policy & Reporting Procedures by engaging in disparate treatment and potentially disparate impact discrimination.

In addition, Mr. Lock's and Ms. Stewart's actions created a work environment for Mr. ██NM EMP██ and Mr. ██NM EMP██ based on their protected class status that was intimidating, hostile, or abusive, which constitutes harassment, a violation of the County's Nondiscrimination, Anti-Harassment & Inappropriate Conduct Policy & Reporting Procedures.

---

[24] EEOC Enforcement Guidance on National Origin Discrimination, https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_ftnref131